UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:17-cr-00073-JAW-4 |
| | ) | |
| NICOLE TRUMAN | ) | |

**ORDER ON MOTION FOR COMPASSIONATE RELEASE**

A prisoner serving a seventy-month sentence for her involvement in a drug conspiracy moves for compassionate release to home confinement under 18 U.S.C. § 3582(c)(1)(A)(i) due to the dangers posed by the COVID-19 pandemic.  Even though the prisoner's medical conditions put her at risk of severe complications from COVID-19 and she has made a showing of rehabilitation, the Court concludes that the seriousness of the prisoner's offense, the need for just punishment, deterrence, and the low number of known COVID-19 cases among inmates at her prison weigh against release.  The Court dismisses the motion without prejudice.

## I.     PROCEDURAL BACKGROUND

On December 11, 2018 the Court sentenced Nicole Truman to a seventy-month term of incarceration, three years of supervised release, a $100 special assessment, and no fine.  *J.* at 1-3, 6 (ECF No. 782).  The Court sentenced Ms. Truman after she pleaded guilty on May 24, 2018 to charges of conspiracy to distribute and to possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(C).  *J.* at 1; *Min. Entry* (ECF No. 519).  On April 17, 2020, the United States filed a Satisfaction of Judgment, informing the Court that Ms. Truman paid her $100 special assessment in full.  *Satisfaction of J.* (ECF No. 1004).

On September 14, 2020, Ms. Truman moved for compassionate release. *Emergency Mot. Requesting Immediate Release Under U.S.C. 3582(c)(1)(A) Extraordinary and Compelling Reasons* (ECF No. 1017) (*Def.'s Pro Se Mot.*). On September 17, 2020, the Court appointed Attorney Michael Whipple to represent Ms. Truman and ordered her to file an amended petition or notify the Court that she would proceed on the initial petition by September 24, 2020. *Appointment of Counsel & Scheduling Order* at 1 (ECF No. 1022).

After several extensions, Ms. Truman filed an amended motion for compassionate release on October 9, 2020. *Am. Mot. and Mem. In Supp. of the Mot. for Compassionate Release* (ECF No. 1040). She filed a revised version of that motion on the same day. *Am. Mot. and Mem. In Supp. of the Mot. for Compassionate Release* (ECF No. 1041) (*Def.'s Mot.*). She also attached three hundred and fifty pages of redacted medical records and a medical chronology, which lists her various health conditions and cites the page numbers within her medical records with information relevant to these conditions. *Id.*, Attach. 1, *Bureau of Prisons, Health Services Medical Records* (*Truman Med. R.*); *id.*, Attach. 2, *Nicole Truman – Medical Chronology*.

On October 16, 2020 the Government filed its opposition. *Gov't's Obj. to Def.'s Mot. for Compassionate Release* (ECF No. 1043) (*Gov't's Opp'n*). The Government also filed three attachments. First, it attached a document detailing, among other things, the date on which Ms. Truman becomes eligible for home detention. *Id.*, Attach. 1, *Sentence Monitoring Computation Data As of 09-16-2020* (*Truman Sentence Data*).

2

Second, the Government attached Ms. Truman's Request for Reduction in Sentence Form.  *Id.*, Attach. 2, *Request for Reduction in Sentence Form* (*Truman BOP Req.*). Third, the Government attached the warden's response to Ms. Truman's request.  *Id.*, Attach. 3, *RIS – Warden Resp. to Inmate* (*Warden Resp.*).

On October 26, 2020, Ms. Truman replied to the Government.  *Def.'s Resp. to Gov't's Obj. to Mot. for Compassionate Release* (ECF No. 1044) (*Def.'s Reply*).  On November 9, 2020, Ms. Truman filed a brief supplement to her reply, which notified the Court that HCI Hazelton had recently suspended all visits to the facility.  *Suppl. to Def.'s Resp.* (ECF No. 1046).  In addition, she submitted another document dated November 2, 2020 indicating that all out of cell time and inmate programs were suspended, as well as work details outside of food service and the outside warehouse. *Id.*, Attach 1, *Notice to the Inmate Population* (*Hazelton Nov. Notice*).

## II.   THE PARTIES' POSITIONS

### A.   Nicole Truman's Motion for Compassionate Release

The crux of Ms. Truman's motion for compassionate release is that her health conditions, when combined with the conditions inside FCI Hazelton, the COVID-19 pandemic, and the upcoming cold and flu season, "subject [her] to risk of severe illness or death should she contract" COVID-19.  *Def.'s Mot.* at 1.

Ms. Truman begins by discussing her medical conditions.  *Id.* at 2.  She states that she is thirty-eight years old and "struggles with obesity, high blood pressure, and an array of mental health disorders . . . which undoubtedly negatively impact and contribute to her physical health."  *Id.*  She also notes that she "copes with chronic

3

pain and neuropathy in her left leg and foot caused by a serious motor vehicle accident in 2007 that led her to undergo six reconstructive surgeries." *Id.* She has chronic back pain due to a herniated disk. *Id.* She states that she is obese, with a BMI of 34.8, and observes that the Centers for Disease Control and Prevention (CDC) has concluded obesity puts a person at higher risk of serious complications from COVID-19. *Id.* She also informs the Court that she suffers from hepatitis C. *Id.* at 2-3. However, she notes that the CDC has not yet determined whether hepatitis C increases a person's risk from COVID-19, but other liver conditions generally do. *Id.* at 3.

After presenting the legal standard for deciding a motion for compassionate release, Ms. Truman first argues that her motion is timely under 18 U.S.C. § 3582(c)(1)(A)(i). *Id.* at 3-5. She declares that she has met the statute's so-called exhaustion requirement because "[s]he requested and was denied compassionate release by the warden at FCI Hazelton in July 2020." *Id.* at 5.

Ms. Truman next contends that extraordinary and compelling reasons weigh in favor of releasing her to home confinement. *Id.* She notes that her health conditions, including obesity, hypertension, and chronic viral hepatitis C "would not ordinarily allow for compassionate release, [but] her medical conditions combined with the presence of the global pandemic . . . constitutes an 'extraordinary and compelling reason' . . . and supports granting her compassionate release." *Id.* at 5-6. Ms. Truman then argues that her specific physical health conditions, alongside her

mental health conditions, and the number of COVID-19 cases within FCI Hazelton weigh in favor of her release.  *Id.* at 6-7.

In the closing paragraphs of her motion, Ms. Truman argues that she is not a danger to the community and presents her release plan.  *Id.* at 7-8.  She points out that she "has no history of violence."  *Id.* at 7.  Rather, her criminal history consists of "a 2008 conviction for operating after suspension or revocation; a theft conviction from 2010; an unlawful possession conviction from 2014; and, in 2015, convictions for unlawful possession and violation of conditions of release."  *Id.*  If released, she plans to live with her grandmother in Farmingdale, Maine, obtain state-funded health insurance, and seek employment.  *Id.* at 8.

### B.    The Government's Opposition

The Government opposes releasing Ms. Truman.  *Gov't's Opp'n* at 1.  While conceding that Ms. Truman's obesity is "an extraordinary and compelling reason warranting her release," the Government argues that (1) the danger she poses to the community, (2) the § 3553(a) factors, and (3) the absence of active COVID-19 cases at FCI Hazelton counsel against releasing Ms. Truman.  *Id.*

The Government first notes that Ms. Truman has been incarcerated at FCI Hazelton in Bruceton Mills, West Virginia.  *Id.* at 2.  The Government claims that as of filing, her "most recent sentencing computation indicates that she has served two years, ten months and 23 days of her 70 month . . . sentence."  *Id.*  According to the Government this is "approximately 49% of her total sentence."  *Id.*  Apparently, "[a]s of October 15, 2020, Hazelton FCI is among the least affected BOP facilities in the

country." *Id.* The Government claims that no inmates have contracted the virus and that there have been no deaths at the facility; however, "five staff members have contracted the virus, but recovered . . .." *Id.*

Next, the Government discusses the steps that the BOP has taken to combat the COVID-19 pandemic. *Id.* at 2-3. According to the Government, first put in place in 2012, "[t]he plan addresses social distancing, hygienic and cleaning protocols, and the treatment of symptomatic inmates." *Id.* at 2-3. The BOP "began planning for potential coronavirus transmissions in January" and is now in "Phase Nine of the Action Plan." *Id.* at 3. Under this iteration of the plan, certain BOP inmate-enrichment, education, and treatment programs have resumed, albeit with social-distancing measures and capacity limits. *Id.* Inmate recreation has also resumed. *Id.* at 3-4. There are restrictions on who can access BOP facilities, testing measures for new inmates and inmates transferred between facilities, and policies regulating the use of face coverings within the BOP. *Id.* at 4-5. The Government claims that "[t]aken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution." *Id.* at 5.

Shifting to the motion's merits, the Government concedes that Ms. Truman's motion is timely. *Id.* at 8 n.6. Nevertheless, the Government contends that the Court should deny the motion because Ms. Truman "poses a danger to the public and the 3553(a) factors do not weigh in favor of her release." *Id.* at 8. The Government also concedes that Ms. Truman's obesity in the time of COVID-19 is an extraordinary and compelling reason warranting compassionate release. *Id.* In reaching this

6

conclusion, the Government highlights that the CDC has concluded obesity is a medical condition that results in a heightened risk of serious complications from COVID-19.  *Id.* at 8-9.  However, the Government flags that it "does not concede that her obesity makes it more likely that [Ms. Truman] will contract COVID-19 at Hazelton FCI . . . [because] the prison has among the lowest infection rates of all the BOP facilities."  *Id.* at 9.

The Government addresses whether Ms. Truman poses a danger to the community.  *Id.* at 10.  The Government avers that she does, due to her involvement in a major drug trafficking conspiracy between 2015 and 2016 and the fact that "she was on bail for a state charge of unlawful trafficking in March 2016" and "was serving a deferred disposition for a drug offense" during 2015.  *Id.*  The Government also discusses Ms. Truman's history of substance abuse and addiction and intimates that it was "her substance abuse that led her to become significantly involved in the drug conspiracy."  *Id.* at 11.  In addition, the Government reminds the Court of Ms. Truman's involvement in the drug conspiracy which funneled large amounts of heroin and cocaine base from Rochester, New York into small communities in central Maine. *Id.* at 12-13.  Specifically, the Government notes that Ms. Truman "was found to have been involved in the distribution of 2,068.93 grams of crack cocaine and 2,065.63 grams of heroin . . .."  *Id.* at 13.  Apparently, Ms. Truman reported that she used "a gram of heroin per day" during the life of the conspiracy.  *Id.*

The Government next explains that it is Ms. Truman's "addiction that drives her to commit crimes."  *Id.* at 14.  It states that Ms. Truman "has participated in a

7

myriad of drug addiction treatments and none have been able to get her addiction under control. . ..." *Id.* Therefore, the Government concludes that "forced sobriety and drug treatment" through incarceration will "protect[] the public from future crimes by [Ms. Truman] . . .." *Id.* In addition, the Government suggests that the Court should consider specific deterrence, because it imposed a seventy-month sentence when Ms. Truman's guideline range was one hundred and eight to one hundred and thirty-five months. *Id.* The Government fears that a further reduction "would send the wrong deterrent message to her." *Id.* In the same vein, the Government states that releasing Ms. Truman after she has only served about half of her sentence "based on a concern that [she] might get ill <u>if</u> she contracts COVID, does not reflect the seriousness of the offense, promote respect for the law, or provide just punishment . . . [i]t unintentionally sends the message to [Ms. Truman] (and others) that . . . the offense is not that serious and she has been punished enough." *Id.* (emphasis in original).

The Government concludes by pointing out that Ms. Truman's risk of COVID-19 infection at FCI Hazelton is low. *Id.* at 15. It observes that no inmates at FCI Hazelton have been infected with COVID-19, although two staff members are positive, and five staff have contracted COVID-19 but recovered. *Id.*

### C.   Nicole Truman's Reply

Ms. Truman begins her reply by arguing that the Government's two concessions that (1) Ms. Truman's motion is timely and (2) "extraordinary and

compelling reasons are present to warrant [a sentence reduction]" shift "the needle . . . in favor of her release . . .." *Def.'s Reply* at 1.

Ms. Truman first responds to the Government's argument that she is a danger to the community. *Id.* at 2. She claims that "this argument falls flat on two accords: first, it fails to recognize that addiction, although perhaps uncurable, is a treatable disorder if managed appropriately. Second, the Government fixates solely on retribution as the purpose of incarceration, and thereby, perhaps inadvertently, elects to ignore the role that incarceration plays in one's rehabilitation." *Id.*

Regarding addiction, Ms. Truman cites several scholarly articles for the premise that addiction can be both treated and controlled. *Id.* at 3. Ms. Truman summarizes these articles, stating that "the key takeaway is that, although the Government holds the position that [Ms. Truman's] lack of success with prior treatments due to subsequent relapses indicates that she is unfixable and thus poses a danger to society, persons with addiction are not beyond recovery." *Id.* Moreover, once again citing the literature, she argues that relapse is a symptom of the disease and does not definitively establish that treatment failed. *Id.* at 3-4.

Regarding rehabilitation, Ms. Truman argues that she "has utilized her time in prison as a rehabilitative opportunity and is effectively treating and managing her addiction." *Id.* at 4. She states that she "attended weekly counseling sessions and Narcotics Anonymous meetings while incarcerated before the onset of COVID-19." *Id.* She reminds the Court that one of the corrections officers who knew her during her 2017-2018 incarceration at Piscataquis County Jail described her as "one of the

most well-behaved inmates" he had encountered in his nineteen years as a corrections officer.  *Id.* at 5.

Ms. Truman next responds to the Government's analysis of the 18 U.S.C. § 3142(g) factors.  *Id.*  She contends that although Ms. Truman was on bail and a deferred disposition in 2015 when she "was convicted on state charges of Unlawful Possession of Scheduled Drugs and Violating Conditions of Release" that conviction "only highlights her past and untreated addiction, which is now in remission."  *Id.* Moreover, she states that the 2016 state drug trafficking charge, which was pending at the time of her arrest, is of no consequence.  *Id.* at 6.  This, she claims, is because that charge was "based upon the same conduct as the instant offense."  *Id.* at 6.  She continues by contending that the Government's observation that she has had no documented incidents of misconduct during her incarceration demonstrates that she has substantially rehabilitated herself.  *Id.* (citing *Gov't's Opp'n* at 10).  Moreover, she argues "[t]he risk to the community is further abated by the fact that [she] will be on federal supervised release should this Court grant her request for compassionate release."  *Id.*  Thus, she concludes that, if released, she "would certainly prove not only that she poses no risk to society, but has the potential to be a contributing member of it as well."  *Id.* at 7.

In the closing pages of Ms. Truman's motion, she discusses the recent uptick in COVID-19 across the nation during October 2020.  *Id.* at 7-8.  She mentions how "it appears that case surges in prisons have been nearly a month behind when those were seen in the general population . . .."  *Id.* at 8.  She highlights how her plan to be

released to her grandmother's home will reduce her risk of contracting COVID-19. *Id.* at 9. She also argues that such a release is consistent with ensuring that her punishment sufficiently deters future criminality because, due to the COVID-19 pandemic and lack of services within the BOP, her current confinement "is just simply more punitive than intended." *Id.*

Finally, Ms. Truman contends that it is not necessary to keep her in prison just to avoid sentencing disparities between her and her co-conspirators. *Id.* at 10. She argues that "compassionate release in the age of COVID-19 is not about what is fair or equal amongst prisoners. It is granted not to lessen one's punishment or diminish the seriousness of one's culpability; it is about life and death and is granted to those most at-risk facing the pandemic." *Id.* She says that the Government "offers a jaded perspective . . . that belittles the fact that [she] has served nearly two years and eleven months during which the world has been coping with this century's most serious global pandemic." *Id.* Thus, she concludes that her sentence of imprisonment should be reduced to time served, followed by three years of supervised release. *Id.* at 11.

## III.   LEGAL STANDARD

In relevant part, 18 U.S.C. § 3582(c)(1)(A)(i) states:

The Court may not modify a term of imprisonment once it has been imposed except that . . . in any case . . . the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment . . . after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent that they are applicable, if it finds that . . . (i) extraordinary and compelling reasons warrant such a reduction

11

. . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . ..

Before a court considers a defendant's motion for compassionate release, it must determine that the defendant meets the procedural requirements for filing such a motion. *See United States v. Lugo*, No. 2:19-cr-00056-JAW, 2020 U.S. Dist. LEXIS 63673, 2020 WL 1821010, at *3 (D. Me. Apr. 10, 2020) (finding the exhaustion or thirty-day requirement of section 3582(c) mandatory). When, as here, a defendant shows exhaustion, a court must consider the merits and determine whether "extraordinary and compelling reasons warrant" the movant's release, considering in its determination "the factors set forth in section 3553(a)" and "applicable policy statements issued by the Sentencing Commission . . .." 18 U.S.C. § 3582(c)(1)(A)(i).

The United States Sentencing Commission issued a policy statement under United States Sentencing Guideline § 1B1.13 for addressing compassionate release motions under § 3582(c)(1)(A). The Guidelines note that the movant must meet the "requirements of subdivision (2) . . .." U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018). Subdivision (2) provides that a court must determine that "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g) . . .."

Section 3142(g) sets forth the factors a court must consider before releasing a person pending trial and these standards are incorporated into the assessment of a request for compassionate release. They include (1) the nature and circumstances of the offense, specifically whether the crime is a crime of violence or involves a controlled substance; (2) the weight of the evidence against the person; (3) the history

12

and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.  18 U.S.C. § 3142(g).  Regarding the history and characteristics of the person, the statute provides that the court must consider:

> (A)    the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B)    whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . ..

18 U.S.C. § 3142(g)(3)(A-B).

After a court has determined whether the defendant is dangerous, § 1B1.13 provides that the court should determine whether "extraordinary and compelling reasons" exist to release the defendant.  U.S. SENTENCING GUIDELINES MANUAL § 1B1.13 cmt. n.1 (U.S. SENTENCING COMM'N 2018).  The policy statement provides that "extraordinary and compelling reasons" may exist under any of the following circumstances:

> (A)    **Medical Condition of the Defendant.—**

> > (i)    The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

> > (ii)   The defendant is—

(I)      suffering from a serious medical condition,

(II)     suffering from a serious functional or cognitive impairment, or

(III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B)    **Age of the Defendant.**— The defendant (i) is at least 65 years old; is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C)    **Family Circumstances**.—

(i)      The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii)     The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D)    **Other Reasons.**— As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* § 1B1.13 cmt. n.1(A-D). The policy statement also provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." *Id.* § 1B1.13 cmt. n.2. Lastly, the policy statement states that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." *Id.* § 1B1.13 cmt. n.3.

14

The movant bears the burden of proving that she is entitled to a sentence reduction, and "the Court has broad discretion to grant or deny a motion for sentence reduction." *United States v. Curtis*, No. 1:14-cr-00140-JAW, 2020 U.S. Dist. LEXIS 102045, at *12 (D. Me. June 11, 2020) (quoting *United States v. Britton*, No. 18-cr-108-LM, 2020 U.S. Dist. LEXIS 83396, at *4 (D.N.H. May 12, 2020) (internal citations omitted)).

## IV.   FACTUAL BACKGROUND

### A.   The Presentence Investigation Report

The Court relied upon and adopted a revised presentence investigation report (PSR) prepared by the U.S. Probation and Pretrial Services System (PO) when it sentenced Ms. Truman.[1] *Statement of Reasons* at 1 (ECF No. 783); *U.S. Probation Filing*, Attach. 3, *Revised Presentence Investigation Report* (ECF No. 1019) (*PSR*).

#### 1.   Nicole Truman's History and Characteristics

Nicole Anne Truman was born in August 1982 in Augusta, Maine to Terry Knox and Robert Truman. *PSR* ¶ 34. Her parents separated and divorced shortly after her birth. *Id.* When she was around three years of age, her mother married a man named Kenneth Venoit. *Id.* The marriage lasted about ten years, and Ms. Truman has two half-siblings born from this union. *Id.* Prior to her sentencing, Ms. Truman reported that she maintained a relationship with her half-siblings, but

---

[1]   The Court adopted the PSR with one change. *Statement of Reasons* at 1. The Court determined that the relevant quantity of narcotics was 9,450 kilograms of converted drug weight, not 9,453.78 kilograms as recommended in the PSR. *Id.* This slightly lower figure did not affect the guideline range.

that the relationship was strained because of her substance use. *Id.* In 2007, her mother remarried Norman Knox, Ms. Truman's stepfather. *Id.*

Ms. Truman grew up in the greater Augusta, Maine area and was raised primarily by her mother. *Id.* ¶ 35. She saw her father infrequently while she was growing up, and her early life was difficult. *Id.* She claims her father attempted suicide when she was five years old. *Id.* She also states that she had a difficult relationship with her then-stepfather, Kenneth Venoit. *Id.* After her mother and stepfather divorced, she claims that things went downhill, her mother began drinking and partying, and they moved thirteen times in a couple of years. *Id.* She said that her mother "stopped being a parent" and that she ended up caring for her siblings more than her mother did. *Id.* She states that her mother supplied her with alcohol, and she first became pregnant at the age of fifteen. *Id.* She reports that she was physically and sexually abused by family and intimate partners, both as a child and adult. *Id.* ¶ 36. She graduated from Gardiner Area High School in 2000 and took a semester of classes at Central Maine Community College. *Id.* ¶ 42. She was unemployed for the ten years before her arrest for this offense. *Id.* ¶ 43.

Ms. Truman reported that she now enjoys a good relationship with her mother and stepfather and maintained daily contact with her mother at the time of her sentencing. *Id.* ¶ 34. However, Ms. Truman has no contact with her father or his wife. *Id.* Ms. Truman has three paternal half-siblings but has contact only with her eldest half-brother. *Id.*

Ms. Truman has two children. *Id.* Both children were born before Ms. Truman reached age eighteen. *Id.* Their father is Jesse Ahearn. *Id.* Ms. Truman indicated that she has a good relationship with her daughter, who is a teacher. *Id.* At the time of her sentencing, Ms. Truman had signed over primary custody of her son to Jesse Ahearn and was delinquent in paying weekly child support. *Id.* The PO noted in the PSR that there was some evidence Ms. Truman dated her co-defendant, D.W. Morang, during her involvement with the instant drug trafficking conspiracy. *Id.*

The PSR also reveals that Ms. Truman suffers from several physical, mental, and substance use-related conditions. *Id.* ¶¶ 38-41. Physically, she was in a serious car accident in October 2007, which resulted in broken ribs and structural damage to her left leg, ankle, and foot. *Id.* ¶ 38. She also has herniated disks in her back, lower back pain, lower extremity edema, and hepatitis C. *Id.* Ms. Truman also has several mental health conditions. *Id.* ¶ 39. As of her sentencing she was diagnosed with bipolar affective disorder, depression, generalized anxiety disorder, mood disorder, complex-type post-traumatic stress disorder, borderline personality disorder, and insomnia. *Id.* There is some evidence that she once attempted suicide. *Id.*

Ms. Truman has a significant history of substance use and abuse. *Id.* ¶ 40. She first drank alcohol at the age of twelve. *Id.* She reports that in 2017 she was drinking one-half gallon of vodka per day. *Id.* She states that she was a daily user of marijuana for a number of years. *Id.* She first abused prescription narcotics in 2004 but stopped in 2016. *Id.* At the height of her addiction, she was consuming three 30 milligram Oxycodone pills per day. *Id.* She has used methadone. *Id.* She

has used both powder and crack cocaine.  *Id.*  She claims that at her worst, she was smoking a couple of grams of cocaine per day.  *Id.*  She started abusing heroin in 2007 and continued using it until 2016.  *Id.*  Between 2015 and 2017 she states that she was consuming one gram of heroin per day.  *Id.*  She has used methamphetamine, ketamine, Ritalin, LSD, psilocybin mushrooms, and "Molly."  *Id.*  She was sober from narcotics for a brief time in 2017 but relapsed about a month before her arrest while she lived in Missouri.  *Id.*  During this period of time she was drinking one pint of alcohol per day.  *Id.*

Ms. Truman has sought treatment for her substance use disorders on several occasions at various facilities around the state of Maine.  *Id.* ¶ 41.  Records associated with some of these attempts at treatment reveal she has been diagnosed with polysubstance abuse, intravenous drug use, continuing alcohol abuse, opioid dependence, cannabis dependence, cocaine dependence, and benzodiazepine dependence.  *Id.*  She was hospitalized in 2013 after an opioid overdose.  *Id.*

### 2.   Nicole Truman's Criminal History

In addition to her federal conviction, Ms. Truman has several prior state convictions.  In 2008, she was convicted of operating after suspension or revocation of her license and theft by unauthorized taking or transfer.  *Id.* ¶ 25.  She paid a $250 fine on the suspension charge and a $100 fine with $57.50 of restitution on the theft charge.  *Id.*  She has a 2010 conviction for theft by unauthorized taking or transfer, for which she was sentenced to a $500 fine and $10 of restitution.  *Id.* ¶ 26.  This

conviction stemmed from the theft of six "Twisted Tea" malt alcohol beverages from a Rite Aid in Augusta, Maine. *Id.*

Ms. Truman's first drug conviction arose from a 2014 traffic stop during which she was arrested on an outstanding warrant for unlawful possession of scheduled drugs. *Id.* ¶ 27. During the traffic stop, law enforcement found heroin and drug paraphernalia in her purse. *Id.* Ms. Truman pleaded guilty to a deferred disposition, but her bail was later revoked. *Id.* She was sentenced to fourteen days incarceration, a $400 fine, and $60 of restitution. *Id.*

The revocation of Ms. Truman's bail stemmed from a March 2015 incident. *Id.* ¶ 28. There, she was a passenger during a 2015 traffic stop and was found in possession of a partial Suboxone strip. *Id.* She also submitted a urine test, which revealed that morphine, marijuana, and cocaine were present in her system. *Id.* As a result, she was sentenced to three days incarceration and a $400 fine for unlawful possession of a scheduled drug, and three days incarceration for violating a condition of her release. *Id.*

Finally, on March 24, 2016 she was charged in state court with unlawful trafficking in scheduled drugs. *Id.* ¶ 32. This charge was pending at the time of her federal sentencing and is based upon the same conduct supporting her federal conviction. *Id.* She was a criminal history category III. *Id.* ¶ 29.

### 3.    Nature and Circumstances of the Offense

Ms. Truman's arrest and conviction followed a lengthy investigation by the United States Department of Justice (DOJ), the Drug Enforcement Agency (DEA),

the Maine Drug Enforcement Agency (MDEA), and other law enforcement agencies. *Id.* ¶ 3.  That investigation began no later than January 2016.  *Id.*

Investigators learned of a conspiracy, which began in approximately 2015, to possess with intent to distribute heroin, fentanyl, and cocaine base in central Maine. *Id.* ¶ 4.  Drug traffickers with ties to the Rochester, New York area recruited several individuals to make weekly trips from Rochester to Maine, toting crack and heroin prepackaged for resale.  *Id.*

Upon arrival in Maine, the traffickers delivered the heroin and crack to safe houses, which the conspiracy then used as staging points to distribute the narcotics. *Id.*  Next, the conspirators would deliver the supply from the safe houses to "trap houses" where individuals both from Maine and from outside Maine distributed the drugs.  *Id.*  At peak, there were between twelve to fifteen trap houses across central Maine.  *Id.*  Mainers who opened their homes to the conspiracy were compensated with drugs or cash.  *Id.*

A man named Darrell Newton led the drug trafficking organization.  *Id.* ¶ 5. He controlled the supply of drugs, received the proceeds, and organized the conspiracy.  *Id.*  Mr. Newton remained in Rochester, New York for most of the conspiracy, and relied upon two men—Denton Worrell and Jamie Betances—to oversee the distribution network in Maine.  *Id.*  Most of the distribution activities were carried out by "workers"—individuals who stayed in back rooms of the trap houses.  *Id.*  The workers provided drugs to the trap house's owner who then handed

them to the customer. *Id.* Other individuals acted as drug runners, drivers, and distributors. *Id.*

Ms. Truman distributed crack and heroin as part of the conspiracy. *Id.* She introduced conspirators from Rochester to drug customers in Maine. *Id.* She dropped off drugs and picked up proceeds of various drug sales. *Id.* She was also the primary individual in the conspiracy responsible for identifying and recruiting Maine residents willing to turn their homes over to the drug trafficking organization for use as trap and stash houses. *Id.* Her co-conspirators trusted her to conduct large quantity pick-ups and drop-offs. *Id.* She received drugs in exchange for her participation in the conspiracy. *Id.* The PO described Ms. Truman's role in the conspiracy as "essential" but categorized her as "an average participant." *Id.*

Testimony from her co-conspirators established that Ms. Truman participated in the conspiracy from January 2015 to October 2016. *Id.* ¶ 6. In 2015, she was primarily involved with facilitating pick-ups and drop-offs. *Id.* In 2016, she mainly sold drugs. *Id.* To avoid a disparity among co-conspirators in drug quantity, the PO calculated that Ms. Truman was responsible for 1,950 grams of heroin and 1,950 grams of crack cocaine in 2015. *Id.*

On March 22, 2016, investigators executed a search warrant for a trap house located on Mt. Vernon Avenue in Augusta, Maine. *Id.* ¶ 7. Ms. Truman, a Rochester worker, and D.W. Morang were present and arrested by state authorities on drug charges after the search. *Id.* Investigators located 7.8 grams of crack cocaine and 5.5 grams of heroin during the search in a bedroom containing Ms. Truman and

Mr. Morang's possessions. *Id.* Law enforcement also found a ledger which detailed the amount of crack and heroin the conspirators paid Ms. Truman to use the apartment, the amount of crack and heroin sold, the quantity of drugs dropped off at the apartment, and the amount of proceeds picked up from the apartment. *Id.*

The ledger revealed that during a two-week period in early March 2016, Ms. Truman and Mr. Morang received one 0.25-gram bag of crack, and one 0.25-gram bag of heroin per day, which totaled 4.5 grams of each drug. *Id.* The PO attributed drug quantity by totaling the amount of money in the ledger, which was $8,252, and divided it by $200 per gram. *Id.* This yielded 20.63 grams of heroin and 20.63 grams of crack, after the PO divided the drug quantity equally between the two substances. *Id.* The PO also attributed one G-pack of narcotics per week to Ms. Truman for the remaining 34 weeks in 2016 during which she was involved in the conspiracy. *Id.* This equates to 85 grams of heroin and 85 grams of crack during that stretch when divided equally among the two drugs. *Id.* The PO characterizes this estimate as "conservative" because of testimony that tended to show Ms. Truman was a more active dealer than others in the conspiracy. *Id.*

In total, the PO found Ms. Truman responsible for 2,065.63 grams of heroin and 2,068.93 grams of crack cocaine. *Id.* ¶ 8. Because the case involved two different types of narcotics, the PO converted the drugs to their marijuana equivalents, which totaled 9,453.78 kilograms of marijuana. *Id.*

### 4.    Sentencing Guideline Calculations

At Ms. Truman's sentencing, the Court concluded that she had a Criminal History Category of III and an Adjusted Total Offense Level of 29.  *Statement of Reasons*, Attach. 1, *Findings Affecting Sentencing* ¶¶ 4-5 (ECF No. 783).  The applicable guideline range of imprisonment was 108 to 135 months, a term of supervised release not less than three years, a fine ranging from $30,000 to $1,000,000, and a mandatory $100 special assessment.  *Id.* ¶¶ 6-9.

The Court departed downward under the guidelines and varied downward still further in imposing the sentence.  The Court sentenced Ms. Truman to seventy months incarceration, three years of supervised release, no fine, and a $100 special assessment.  *J.* at 1-3, 6.

### B.    Nicole Truman's Medical Records

The Court reviewed the medical records Ms. Truman submitted.  Ms. Truman identified the following medical and psychological conditions as relevant to her motion: obesity, high blood pressure, and mental health disorders, including bipolar affective disorder, depression, generalized anxiety disorder, complex-type post-traumatic stress disorder, mood disorder, borderline personality disorder, and insomnia.  *Def.'s Mot.* at 2.  She also identified chronic hepatitis C as a potential risk factor.  *Id.* at 3.  These conditions are corroborated by the prison medical records.  *Truman Med. R.* at 3-4.

## V.     DISCUSSION

### A.     Exhaustion

Section 3582(c)(1)(A)'s exhaustion requirement is non-jurisdictional; it is a mere claim processing rule. *United States v. Whalen*¸ No. 1:11-cr-00033-JAW, 2020 U.S. Dist. LEXIS 118896, at *17-18 (D. Me. July 7, 2020).  As such, the Government can waive or concede it.  *Id.* at *18.  When the Government waives exhaustion, the Court may address the merits of a motion for compassionate release.  *Id.*  Here, the Government concedes that Ms. Truman's claim is timely.  *Gov't's Opp'n* at 8 n.6. Moreover, more than thirty days have passed since July 17, 2020 when she asked the warden at FCI Hazelton to move for her release.  *See Truman BOP Req.* at 1. Therefore, the Court concludes that Ms. Truman's motion is timely and considers the merits.

### B.     Danger to the Community

18 U.S.C. § 3142(g) requires the Court to consider whether the defendant has a history of controlled substance offenses or crimes of violence.  In addition, the Court must consider "whether, at the time of the current offense or arrest, [Ms. Truman] was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law . . .."  18 U.S.C. § 3142(g)(3)(B).

Here, the Court concludes that Ms. Truman has not met her burden to show that she is no longer a danger to the community.  In addition to the offense-of-conviction in this case, the record reveals that Ms. Truman has a history of controlled

substance offenses and was on bail for a state offense at the time of her federal arrest.[2]  As Ms. Truman points out, the state charge stemmed from the same conduct for which she was federally prosecuted.  *Def.'s Reply* at 5-6.  Her PSR reveals that she also violated the conditions of release for a state drug offense in 2015.  *PSR* ¶ 28.  The Court rejects Ms. Truman's argument that this conduct is not relevant because she now has control over her addiction.  *Def.'s Reply* at 5.  Ms. Truman's criminal history, which includes two controlled substance offenses and violation of conditions of release, supports a finding that she is a danger to the community.

The seriousness of Ms. Truman's federal offense tips the balance in favor of finding that she remains a danger to the community.  As her PSR makes clear, Ms. Truman played an essential role in a criminal conspiracy to transport heroin and crack cocaine from the Rochester, New York area and distribute these illegal and highly addictive drugs across central Maine.  *PSR* ¶¶ 3-8.  Ms. Truman was involved in the conspiracy for about twenty months.  *Id.* ¶¶ 6-7.  She undertook numerous tasks in furtherance of this conspiracy, such as middling drug deals, directly distributing crack and heroin to addicts, and introducing co-conspirators from Rochester to customers in central Maine.  *Id.* ¶ 5.  She did more than that, though. *Id.*  Ms. Truman took on more critical assignments, including locating and recruiting Maine residents to allow their homes to be used as stash and trap houses for the drug trafficking organization, and serving as one of the few persons in the conspiracy

---

[2]      On March 31, 2015, Ms. Truman was arrested for unlawful possession of a scheduled drug and violation of a condition of release and that on May 29, 2015, she was convicted and sentenced to brief periods of incarceration for both offenses.  *PSR* ¶ 28.  Yet, she continued to participate in the Rochester-based drug trafficking conspiracy after these crimes.

trusted to perform large quantity drop-offs of drugs and pick-ups of drug proceeds. *Id.* In exchange for her assistance, Ms. Truman was paid in drugs.   *Id.* ¶ 7.

The PSR says that what set her apart from other Maine residents is that the higher-level members of the drug trafficking organization trusted her and used her as an intermediary between the Rochester drug dealers and the Maine addicts. *Id.* ¶ 5.  The PSR describes her role as "essential and in no way mitigating." *Id.*

The Court recognizes that Ms. Truman has grappled with addiction since her early teenage years and that her criminality is intertwined with her pursuit of narcotics for her own use.  Ms. Truman's reply contends that the three-year period of sobriety brought on by her incarceration, combined with the treatment she has undergone in BOP custody shows that she is rehabilitated and can be released because she poses no further risk to the community.[3] *Def.'s Reply* at 3-5.

Ms. Truman presented evidence which indicates she is progressing towards successful rehabilitation and overcoming her addiction.  That is commendable, and she should continue her efforts to enrich her physical and mental well-being.  Her substantial efforts at rehabilitation weigh in favor of releasing her.  Even so, the Court declines Ms. Truman's invitation to confidently predict her future.  Currently rehabilitated and free from addiction, she may not be upon release.  As Ms. Truman

---

[3]        The Supreme Court and the First Circuit have held that rehabilitation alone is not an appropriate basis to impose or lengthen a prison sentence. *See United States v. Vázquez-Méndez*, 915 F.3d 85, 87-88 (1st Cir. 2019) (citing *Tapia v. United States*, 564 U.S. 319, 335 (2011)).  However, the First Circuit has observed that a court may consider the need for rehabilitation alongside other factors relevant to sentencing.  *Id.* at 88.  Neither the Supreme Court nor the First Circuit has addressed whether rehabilitation in prison is a proper ground to shorten a sentence.  As consideration of this issue potentially benefits Ms. Truman and as Ms. Truman raised this contention, the Court concludes that it is proper to evaluate it.

recognizes, "relapse is an almost inevitable symptom of the disease." *Def.'s Reply* at 3 (internal citations omitted).

For now, it appears that Ms. Truman is walking the right path, but she is incarcerated, and her path is narrower than when released.  The question is not how she acts while incarcerated, but rather, how she will behave when the BOP releases her to central Maine.  There, she will return to a community where she was a well-known addict and drug dealer and she will face temptations not present in prison.  The Court does not know and cannot accurately predict whether she will return to her addictive behavior when free to do so.

The Court accepts that Ms. Truman has shown impressive progress towards rehabilitation and that this factor favors release.  But Ms. Truman's prior relapses and unsuccessful attempts at treatment undercut the persuasiveness of her rehabilitation argument.  Despite her best efforts and current success, she may relapse.   This uncertainty based on her own conduct means that Mr. Truman's rehabilitation weighs slightly in favor of her release.

In light of Ms. Truman's serious offense-of-conviction, her criminal history of controlled substance offenses, prior violations of supervised release, and uncertainty surrounding her rehabilitation, the Court concludes that Ms. Truman is still a danger to the community.  By itself, this finding precludes her release under 18 U.S.C. § 3582(c)(1)(A)(i).

### C.    Just Punishment and Deterrence

27

The Court must also weigh factors such as whether her sentence "reflect[s] the seriousness of the offense, [promotes] respect for the law, and . . . [provides] just punishment . . . ." 18 U.S.C. § 3553(a)(2)(A).  In addition, the Court must consider deterrence and the need to protect the public.  *Id.* §§ 3553(a)(2)(B)-(C).  In evaluating Ms. Truman's motion, the Court considered the need to impose just punishment for her crime and the importance of specific and general deterrence.  Given the length and breadth of her drug distribution activities, the Court considered and still considers its seventy-month sentence to be "sufficient but not greater than necessary" to achieve the purposes of the law.  18 U.S.C. § 3553(a).  At her sentencing, the Court imposed a sentence below the guideline range and concluded that a more lenient sentence would not be sufficient.  In the Court's view, now imposing a lesser punishment or reducing her period of incarceration would not fit the seriousness of her crime.

The Court is also concerned about the effect of an early release on general deterrence.  This factor is difficult to measure.  But Ms. Truman was an integral figure in the Rochester-based conspiracy's drug distribution network in central Maine for twenty months.  The PSR indicates that she was a prime intermediary between the Rochester drug dealers and the Maine addicts, and the PSR confirms that others were aware of her extensive role in the conspiracy.  Given her notoriety, the Court is worried that her early release would send the wrong message to others, both charged and uncharged, in the illegal drug world of central Maine that the law will treat with leniency even significant dealers of heroin and crack cocaine.  To date, she has only

28

served around fifty percent of an already reduced sentence. *Truman Sentence Data*. This, in the Court's view, is too short a period of incarceration to effect general deterrence.

### D.   Extraordinary and Compelling Reasons

The Government concedes that Ms. Truman's obesity is "an extraordinary and compelling reason warranting her release . . .." *Gov't's Opp'n* at 1. The Court agrees. Ms. Truman's health conditions, which include hypertension, obesity, hepatitis C, and other conditions, present an extraordinary and compelling reason to release her. Even so, that does not resolve this motion. Instead, the Court must analyze the risk COVID-19 poses to Ms. Truman by considering her health conditions and then the relative risk of exposure both inside and outside of prison. Here, the Court undertakes the relevant analysis and concludes that the lack of significant COVID-19 transmission at FCI Hazelton weighs against granting her motion.

### 1.   Nicole Truman's Medical Conditions

According to the Centers for Disease Control and Prevention (CDC), there are several factors that increase a person's risk of severe illness from COVID-19. Arguably, the most decisive factor is a person's age. *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Nov. 19, 2020). Generally, the risk of COVID-19 increases as a person ages, with over eighty-percent of deaths occurring in people who are sixty-five or older. *Id.* However, people younger than sixty-five may still face high risk of

complications.  *Id.*  Fortunately, at age 38, Ms. Truman does not fit within the age-related risk category.

People with certain medical conditions are also at high risk.  *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Nov. 19, 2020) (*CDC COVID Med. Conditions*).[4]

Recent medical records show that she is obese and that her BMI is now 34.8, which places her in a high-risk category. *See Truman Med. R.* at 3-4; *Def.'s Mot.* at 2 (calculating current BMI).  She also has primary hypertension, which the CDC lists as a possible risk factor.  *Truman Med. R.* at 3-4.  She has a history of chronic viral hepatitis C.  Currently, the CDC has no information about whether hepatitis C increases a person's risk from COVID-19, but liver disease might.  *What to Know About Liver Disease and COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/liver-disease.html (last visited Nov. 19, 2020).

Ms. Truman argues that her other conditions, including her psychological conditions, place her at greater risk for COVID-19 complications.  But the CDC has not listed Ms. Truman's psychological conditions as risk factors for complications from COVID-19 and, without more, the Court is reluctant to expand the scope of risk factors beyond the CDC list.

---

[4]      These conditions include: cancer, chronic kidney disease, COPD, heart conditions, weakened immune systems from organ transplants, obesity (BMI > 30), severe obesity (BMI > 40), pregnancy, sickle cell disease, smoking, and Type 2 diabetes.  *See CDC COVID Med. Conditions.*  Moreover, the CDC has indicated that individuals with asthma, cerebrovascular disease, cystic fibrosis, hypertension, non-organ transplant-related immunodeficiencies, neurologic conditions, liver disease, pulmonary fibrosis, Thalassemia, Type 1 diabetes, or who are overweight (BMI > 25), might be at increased risk.  *Id.*

Her documented physical problems are enough.  Given that the CDC has identified obesity as increasing a person's risk of serious complications and that hypertension may increase a person's risk, the Court concludes that Ms. Truman has an increased risk of serious complications should she contract COVID-19.  This finding weighs in favor of her release.

### 2.    FCI Hazelton and COVID-19

The relevant data for analyzing Ms. Truman's risk of exposure to COVID-19 is the data from FCI Hazelton, where she is incarcerated.  Located in Bruceton Mills, West Virginia, FCI Hazelton is a medium security federal correctional institution with a secure female facility.  *FCI Hazelton*, BOP, https://www.bop.gov/locations/institutions/haf/ (last visited Nov. 19, 2020).  The secure female facility houses 384 female inmates.  *Id.*  Currently, there are three active cases among inmates at FCI Hazelton; and three BOP staff members are positive for COVID-19.  *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Nov. 19, 2020).  To date, eight BOP staff at FCI Hazelton have recovered from the virus and none has died.  *Id.*  There have been no known COVID-19 deaths among FCI Hazelton's inmates.  *Id.*

As Ms. Truman's November 9, 2020 supplemental filing notes, FCI Hazelton responded to the national surge in COVID-19 cases by modifying its visitation policy and suspending most inmate education, recreation, and work details.  *Suppl. to Def.'s Resp.*; *Hazelton Nov. Notice* at 1 ("[A]ll out of cell time and inmate programs will be suspended until further notice").  While these limitations no doubt make Ms.

Truman's incarceration less stimulating, she is likely safer now than before the BOP imposed these new restrictions.

These measures appear to be prophylactic. *Hazelton Nov. Notice* at 1. FCI Hazelton's numbers remain among the best in the BOP. *COVID-19 Coronavirus*, BOP, https://www.bop.gov/coronavirus/ (last visited Nov. 19, 2020). At the same time, the Court recognizes that the prison environment is a difficult place to practice effective social distancing and for Ms. Truman to reduce her risk of exposure to COVID-19. The Court further recognizes that, even if FCI Hazelton's COVID-19 numbers are impressive, no correctional facility can remain walled off from the outside world and, regardless of the BOP's vigilance, it is possible that the virus will spread within FCI Hazelton. If it did so, Ms. Truman's ability to protect herself against contracting the virus would be compromised. The Court views this factor as mixed, although slightly favoring Ms. Truman.

### 3.  Maine versus FCI Hazelton

If the Court released Ms. Truman, she would not enter a world free from COVID-19. Therefore, the Court considers what the record reveals about the relative risks of contracting the virus in FCI Hazelton against her preferred residence—her grandmother's home in Farmingdale, Maine. The focus of the petition for compassionate release is on whether an inmate should be released from incarceration based on the risks in federal prison, not whether there are risks outside prison over which the Court has limited authority. However, at the extremes, the Court could

consider the effect of an obviously risky release plan on the merits of a motion for compassionate release.

Ms. Truman provided little information to compare the relative risks. On balance, the Court concludes that although social distancing at FCI Hazelton is likely difficult, FCI Hazelton's low number of cases makes it such that, currently, there is not a legally significant difference between her risk of COVID-19 exposure in Maine versus FCI Hazelton. Still, cases at FCI Hazelton could suddenly increase and, compared to residing with her grandmother, while incarcerated, Ms. Truman would not be able to independently seclude herself and avoid contracting the virus. Thus, the Court concludes that this factor slightly favors releasing Ms. Truman.

### E.    The Balance Weighs Against Granting Nicole Truman's Motion

The Court concludes that modifying Ms. Truman's sentence and releasing her to home confinement is not warranted. In reaching this conclusion, the Court has considered a number of factors, but has given particular weight to the seriousness of Ms. Truman's criminal conduct, the need for just punishment, deterrence, and her presently low risk of contracting COVID-19 while incarcerated at FCI Hazelton. Although Ms. Truman has medical conditions that may well lead to serious complications if she contracts COVID-19, the Court concludes that the balance tilts against releasing her.

## VI.   CONCLUSION

The Court DISMISSES without prejudice Defendant's Second Renewed Amended Motion for Compassionate Release (ECF No. 1041).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 19th day of November, 2020